UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| Plaintiff, ) | |
| v. ) | NO. 5:22-cr-004-DCR-MAS-1 |
| ERICA BAKER, ) | |
| Defendant. ) | |

### REPORT & RECOMMENDATION

Before the Court is Defendant Erica Baker's ("Baker") suppression motion seeking suppression of all statements she made to Federal Bureau of Investigation ("FBI") agents during the execution of a search warrant at her employer's offices on December 16, 2020. [DE 20]. Having thoroughly considered the evidence of record and the parties' arguments, the Court recommends denial of the motion.

### I.    FACTUAL BACKGROUND

The Court held a hearing on Baker's motion on July 6, 2022. [DE 30]. In short, the parties told two very different versions of the search.

The United States called three witnesses at the suppression hearing. The first was Christian Dunkle ("Dunkle"), a special agent with the United States Department of Health and Family Services, Office of Inspector General. [Tr. (Suppression Hearing Transcript), at 3].[1] The second

---

[1] Citations refer to the actual transcript pagination rather than the CM/ECF Page ID numbers.

1

witness was Christopher Schoonover ("Schoonover"), an investigator with the United States Attorney's Office. [*Id*. at 46-47]. Finally, FBI Special Agent Laura Ragozzino (Ragozzino) was called as the third witness. [*Id*. at 63]. The United States also attached to its response to Baker's motion copies of audio files of the interview recorded by both Schoonover and Dunkle as well as a map of the office layout.

The defense called only Baker. Prior to the hearing, Baker also attached to her motion an affidavit setting forth her account of the events relevant to her suppression arguments. [DE 20-2 (Affidavit)]. Baker's testimony at the hearing often differed from her affidavit. And, at the hearing, Baker introduced a Cellebrite report, which is a forensic analysis of data extracted from Baker's phone on December 16, 2020. [Def. Ex. 1 (Cellebrite Report)]. The Cellebrite report contains a timeline of activity on Baker's phone.

The Court will set forth both versions of the events below.

A.  **TESTIMONY OF THE UNITED STATES' WITNESSES**

On December 16, 2020, law enforcement agents executed a search warrant at LabTox, Baker's employer. [Tr. at 4]. Agents first entered the premises around 8:20 a.m. [*Id*. at 5, 77]. Approximately twenty to thirty officers or agents were at the premises that day to secure the busy premises, seize relevant materials, and interview targeted witnesses. [*Id*. at 5]. After officers gathered LabTox employees into a common area on the premises, Dunkle informed the employees that the officers were there to execute a federal search warrant. [*Id*.]. Dunkle explained to the employees that they were not being arrested, officers were not holding them, and that they were free to leave or return to work once the search was complete. [*Id*. at 6].

Baker arrived at the LabTox premises shortly after 9:00 a.m. [*Id*. at 8, 45]. Dunkle was planning to interview Baker that day, so he was quickly made aware of Baker's arrival. [*Id*. at 5, 9]. Dunkle explained to Baker who he was, explained that officers were executing a federal search

2

warrant, and asked Baker if she would be willing to be interviewed. [*Id*. at 10]. Dunkle did not tell Baker that she was required to speak with law enforcement or that Baker would be in trouble if she chose not to do so. [*Id*. at 10-11]. "Pretty soon after" Dunkle and Baker first interacted, Schoonover joined them to assist in conducting the interview. [*Id*. at 11-12]. Schoonover activated a recording device at 9:09 a.m., which he testified occurred within seconds of joining Baker and Dunkle and introducing himself to Baker. [*Id*. at 22, 49-50]. Audio from that recording device captures the entirety of the interview, including the time Schooner spent walking from the area where he met Baker and Dunkle to the interview room. [*Id*. at 50].

Soon after meeting Baker, Schoonover and Dunkle began searching for a space in which to interview Baker. [*Id*. at 16]. Because other agents were searching for items in Baker's office, Dunkle and Schoonover selected another office space to conduct the interview. [*Id*. at 16, 53]. Dunkle testified that he and Schoonover selected the only office that was not occupied, and that they choose to interview Baker in an office instead of the hallway to afford some privacy. [*Id*. at 16-17]. Schoonover testified that the office was approximately eight feet by sixteen feet in size, nearly the same size as Baker's office. [*Id*. at 54-55]. The room contained one door, which was closed but not locked, and it had a window on the top half. [*Id*. at 35, 55, 67-68]. Baker entered the room first, and she chose to sit in a chair at a table facing the door. [*Id*. at 54-55]. Schoonover sat on a stool at a table to the right of the door, and Dunkle stood next to a filing cabinet to the left of the door. [*Id*. at 54-55]. Schoonover was not armed, but Dunkle was armed with a handgun, which was holstered on his hip, during the interview. [*Id*. 19-20; 56-57]. Dunkle testified that he likely carried a small baton, handcuffs, a flashlight, and a spare magazine on his belt, and it was likely that some of those items were visible during the interview. [*Id*. at 20]. However, Dunkle did not manipulate, brandish, or remove any weapons during the interview. [*Id*. at 20, 57].

3

At the beginning of the interview, as reflected by Schooner's audio recording, Dunkle told Baker agents were "here executing a federal search warrant. We're not here to arrest anybody, take anybody to jail." [Gov. Ex. 1, at 0:00:39 – 47 (Schoonover audio recording)]. After informing Baker of the nature of the search warrant, Dunkle again stated that, "Just to be clear, we're not here to arrest anybody, nobody's going to jail, nothing like that. We're only here to get documents and things . . . ." [*Id*. at 0:01:20 – 1:28]. Dunkle also made clear that it was the agents' "intentions to get [laboratory operations] up and running as soon as possible", especially since the lab was busy with COVID testing at the height of the pandemic. [*Id*. at 0:01:33 – 1:47]. Schoonover testified that Baker remained "[p]rofessional, cooperative[,]" and "informational" during the interview. [Tr. at 57]. However, Schoonover admitted that the interview became "a little uncomfortable" when Dunkle advised Baker of 18 U.S.C. § 1001. [*Id*. at 58]. Per Schoonover's recording, Dunkle warned Baker that providing materially false information to a law enforcement officer was a crime in violation of 18 U.S.C. § 1001. [Gov. Ex. 1, at 0:14:05 – 14:37]. To illustrate that crime, Dunkle explained to Baker that Martha Stewart was convicted and sentenced to prison for lying to federal agents during an investigation for insider trading. [*Id*. at 0:14:05 – 14:37]. Dunkle then stated to Baker that "people ha[d] told [him] the exact opposite of what [Baker was] telling him . . . ." [*Id*. at 0:14:30 – 14:50].

Per Schoonover's recording, at no point during the interview did either Dunkle or Schoonover tell Baker that she was not free to leave or indicate to Baker that she could not answer her phone or speak with a lawyer. Although a desk phone rang multiple times during the interview [Gov. Ex. 1, at 0:41:15, 0:52:03, 53:04; Tr. at 27], Baker never requested to answer it. At one point while the desk phone was ringing, Schoonover jokingly stated "I'm not here if it's for me[,]" to which Baker responded, "It's probably definitely for me." [Gov. Ex. 1, at 0:53:03 – :10]. Baker

4

was holding her cell phone during the interview. [Tr. at 52]. And, although both agents testified that they noticed Baker's phone either buzzing or lighting up with notifications, Baker did not ask to answer her phone or respond to any notifications. [*Id*. at 13, 51-52]. Schoonover testified that, throughout his entire interaction with Baker, he did not tell Baker that she had to answer his questions or would be in trouble if she refused to do so, and he did not hear Dunkle make any suggestion of that sort. [*Id*. at 50]. In addition, Dunkle and Schoonover both testified that Baker never indicated to them that her phone was ringing or ask them if she could answer her phone or speak with her lawyer. [*Id*. at 13-15, 51-52]. And both agents acknowledge that they were not aware of any other agents instructing Baker that she could not answer her phone to speak with her lawyer. [*Id*. at 15, 51-52].

At the end of the interview, Baker was not placed under arrest, and she was not instructed to stay on site. [*Id*. at 29]. In fact, Dunkle reiterated that "a bunch of" LabTox employees "are still here. No one was being held, they were allowed to go or stay . . . ." [Gov. Ex. 1, at 1:09:30 - 42]. The interview lasted about 70 minutes. [Tr. at 57, 94].

After the interview, Ragozzino asked Baker for consent to search her cell phone. [*Id*. at 68-70]. Baker asked to speak with Lisa Hinkle, a lawyer for LabTox who was on the premises during the search, and Ragozzino immediately took Baker to where Hinkle was sitting with the president of LabTox, Ron Coburn. [*Id*. at 64, 69]. After consulting in private with Hinkle and Coburn, Baker provided Ragozzino with consent to search her phone and executed a written consent form. [*Id*. at 68-71].

**B.    BAKER'S TESTIMONY AND AFFIDAVIT**

Baker's testimony largely conflicted with that of the United States' witnesses and, at times, her own affidavit. Specifically, Baker asserted that she was prohibited from answering phone calls

5

from LabTox lawyers at various points during her interaction with Dunkle, Schoonover, or another, unnamed FBI agent.

First, in her affidavit, Baker asserted that, upon arriving at LabTox, she interacted with an FBI agent who, after about a minute, instructed her to come with him and guided her to Dunkle. [DE 20-2 at Page ID# 112-13]. At the hearing, she added critical detail to her interaction with this unnamed agent that was absent from her affidavit. She stated that the agent had her wait in the lobby, and she "said instantly that [her] phone was ringing and was told not to use [her] phone." [Tr. at 85]. Baker stated that she asked to speak to Coburn, and she asked to answer her phone because LabTox's lawyers were calling, but she was denied both requests by the agent. [*Id*.]. Baker indicated that she complied with the FBI agent's instruction not to answer her phone, and that she was also told by her co-workers that they were not permitted to use their phones. [*Id*.].

Next, both at the hearing and in her affidavit, the unidentified agent took her to Dunkle. [*Id*.; DE 20-2 at Page ID# 113]. She then noticed LabTox's lawyer, Lisa Hinkle, was calling her cell phone, and she asked Dunkle if she could speak to Hinkle. [Tr. at 85, 90; DE 20-2 at Page ID# 113.]. Baker asserted that Dunkle told her "no" and prohibited her from answering or using her cell phone. [Tr. at 85; DE 20-2 at Page ID# 113.].

From there, the interview began. As mentioned above, there audio never captures any conversation between Dunkle, Schoonover, or Baker referencing her phone in any context. Yet, per Baker's affidavit, during the interview, "Hinkle continued to call my cell phone" and that, "The agents could hear my phone ringing but would not let me answer it." [Tr. at 114]. At the hearing, her testimony again shifted. Baker testified that she indicated in a non-verbal manner to agents that her cell phone was ringing during the interview, but the agents non-verbally instructed her not to answer her phone. [*Id*.].

6

The Cellebrite report of Baker's cell phone activity, which Baker introduced at the suppression hearing, indicates that Baker received three phone calls from lawyers for LabTox between 9:01 a.m. and 9:07 a.m. that morning. [Def. Ex. 1]. Specifically, Baker received one call from attorney Luke Morgan at 9:01 a.m. and two calls from attorney Lisa Hinkle at 9:07 a.m. [Def. Ex. 1; Tr. at 73-74 (FBI Agent Laura Ragozzino's testimony interpreting the Cellebrite report)].[2] Baker did not answer any of those calls, and Hinkle left a voicemail at 9:07 a.m. [Def. Ex. 1; Tr. at 74-75]. The report also indicates that she received one call from Coburn at approximately 9:11 a.m. [Def. Ex. 1; Tr. at 76]. The Cellebrite Report establishes that Baker did not receive any calls from LabTox's counsel during her interview with Schoonover and Dunkle, the recording of which began at 9:09 a.m.

Further, Baker's testimony concerning the nature of her interview with Schoonover and Dunkle also differed from that of the United States' witnesses. Although Baker asserted in her affidavit that both agents were armed, [DE 20-2 at Page ID# 113], she testified at the hearing that she only thought Schoonover was armed because he was wearing a suit and "everyone in the building was armed." [Tr. at 95]. Further, Baker stated in her affidavit that the interview room was roughly the size of a small walk-in closet, approximately eight feet by six feet. [DE 20-2 at Page ID# 113]. Yet, upon cross-examination, she admitted that it was about the same size as her office. [*Id.* at 116]. Baker also stated in her affidavit that she found Dunkle and Schoonover to be "intimidating, aggressive, and threatening[.]" [DE 20-2 at Page ID# 114]. Her testimony at the

---

[2] Ragozzino was somewhat unsure if there were two separate calls from Hinkle at 9:07 a.m. or if it was one call with a second entry on the Cellebrite report indicating a receipt for the resulting voicemail. Ragozzino testified that while she did not have extensive experience with Cellebrite reports, she believed it was the former. Although Department of Justice documents establish the correct answer is the latter, the Court will stick with Ragozzino's version. *See* Office of Justice Programs, United States Department of Justice, "Cellebrite UFEC, Version 1.1.7.6" (July 2012) (https://www.ojp.gov/pdffiles1/nij/nlectc/239594.pdf).

hearing differed, describing Schoonover as always "professional and forthcoming and kind and willing to help" and Dunkle was professional "for the most part." [Tr. at 96]. When asked what Dunkle said or did that concerned her, she only cited Dunkle's warning that providing materially false information to law enforcement officers was a crime in violation of 18 U.S.C. § 1001. [*Id*. at 96, 120; Gov. Ex. 1, at 0:14:05 – 14:37].

## II.  ANALYSIS

Baker maintains that any statements she made during the December 16, 2020, interview must be suppressed because they were taken in violation of her *Miranda* rights, and, relatedly, she was denied her right to counsel after requesting to speak with counsel repeatedly. The Court addresses, and rejects, each argument below.

### A.  FBI AGENTS DID NOT VIOLATE BAKER'S MIRANDA RIGHTS BECAUSE SHE WAS NOT IN LAW ENFORCEMENT CUSTODY

The Fifth Amendment precludes an individual from being "compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. To help safeguard this right, the Supreme Court enacted the familiar prophylactic rule outlined in *Miranda v. Arizona*: "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." 384 U.S. 436, 444 (1966). The *Miranda* rule applies only to custodial interrogations—*i.e.*, "questioning by a law enforcement officer after a person has been taken into custody or otherwise deprived of his freedom of action in a significant way." *Maranian v. Jackson*, 14 F. App'x 310, 313 (6th Cir. 2001). The central issue raised in Baker's motion is whether she was "in custody" for *Miranda* purposes at the time of the questioning. "Where a party seeks suppression of his statements based upon a failure to receive his *Miranda* warnings, he must demonstrate by a preponderance of evidence [ ] that he was entitled to receive them; *i.e.*, that he

8

was subjected to a custodial interrogation." *United States v. Lawrence*, No. 88-2056, 1989 WL 153161, at *5 (6th Cir. Dec. 18, 1989). Based upon an examination of the record, the Court concludes that Baker was not in custody on December 16th, and therefore there could be no violation of her *Miranda* rights.

"A suspect is in custody if, under the totality of the circumstances, a reasonable person would not feel free to end the interrogation by the police and leave." *United States v. Hoyer*, 411 F. Supp. 3d 406, 408 (W.D. Ky. 2019). Interrogation includes both express questioning, as well as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response[.]" *Id.* at 409 (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). The Court considers several factors in assessing the nature of challenged questioning,

> including (1) the location of the interview; (2) the length and manner of the questioning; (3) whether there was any restraint on the individual's freedom of movement; and (4) whether the individual was told that he or she did not need to answer the questions.

*United States v. Hinojosa*, 606 F.3d 875, 883 (6th Cir. 2010).

Despite Baker's arguments to the contrary, each of the four factors weighs in favor of finding that Baker was not in custody.

### 1. Location

First, Baker complains that Agent Dunkle sought out a "secluded place to take" her and located one "as far away from Ms. Baker's colleagues as possible." [DE 20-1 at Page ID# 101]. Baker described the office as a "small walk-in closet." However, Agent Schoonover described the room as "maybe 8 feet wide to 16 feet [long]." [Tr. at 54]. This "interview room" was a lab in

the office building where Baker had worked for six years.[3] The room was approximately the same size as Baker's own office. "[P]olice questioning taking place in the suspect's home or place of work is likely to be less intimidating than questioning taking place at the police station[.]" *United States v. Protsman*, 74 Fed. App'x 529, 533 (6th Cir. 2003). "That the interview took place at [her] jobsite weighs against [her] being 'in custody.'" *United States v. Zabel*, 35 F.4th 493, 502, 2022 WL 1617410, at *4 (6th Cir. 2022) (citing *United States v. Crossley*, 224 F.3d 847, 861-62 (6th Cir. 2000), and *United States v. Mahan*, 190 F.3d 416, 421-22 (6th Cir. 1999)).

### 2.    Length and Manner of Questioning

Baker next argues the manner of questioning was "intimidating and aggressive." [DE 20-1 at Page ID# 102]. Baker complains that the FBI agents did not tell her that she was the target of the investigation because (she believes) they thought she would deny their request for an interview. She described their questioning as an "attack [ ] about breaking the law." [DE 20-1 at Page ID# 102]. Yet, Baker later describes Schoonover and Dunkle, except when he reminded her about lying to federal officers, as "professional and forthcoming and kind and willing to help." [Tr. at 96]. Even Dunkle's reminder that lying to federal officers is a crime is far from coercive. As the Sixth Circuit has repeatedly held, such reminders fall "far short" of coercion. *United States v. Mahan*, 190 F.3d 416, 423 (6th Cir. 1999). Further, the parties agree the interview lasted approximately 70 minutes. The Sixth Circuit has found that interviews of similar durations—or longer—were not custodial. *See*, *e.g.*, *Mahan* at 421-22 (ninety minutes); *Mason v. Mitchell*, 320 F.3d 604, 612, 632 (6th Cir. 2003) (four hours); *United States v. Gillman*, 432 F. App'x 513, 516 (6th Cir. 2011) (eighty minutes); *United States v. Martinez*, 705 F. App'x 367 (6th Cir. 2019) (eighty minutes).

---

[3] Baker indicated in her interview that she had worked for LabTox for six years. [Gov. Ex. 1 at 0:03:25 – 03:22].

### 3. **Restraint on Baker's Freedom**

Baker claims her freedom was restricted during the interview because she was isolated from her colleagues in a small laboratory with two gun-wielding FBI agents who stood between her and the door to prevent her from leaving. Baker claimed Agent Dunkle told her she could not answer her phone when LabTox's lawyer, Lisa Hinkle, called. In fact, according to Baker, Agent Dunkle prohibited Baker from using her phone at all. If this version of events was credible, Baker might have an argument suggesting custody under this factor. Upon closer examination, however, Baker's freedom of movement was not impaired during the interview.

First, the Court notes that Baker's account of this interview is, at best, a shifting narrative that does not support a finding of custodial interrogation even when viewed in the light most favorable to Baker. Once in the laboratory, Agent Dunkle and Investigator Schoonover closed— but did not lock—the door with the three of them inside. The door had a window in it, such that anyone who walked by it could have been seen by Baker and could have seen into the room.

Baker initially stated in her affidavit that both Agent Dunkle and Investigator Schoonover were armed. However, the testimony at the hearing convincingly established that only Agent Dunkle was armed with his holstered duty-firearm during the interview, a fact that Baker conceded. [Tr. at 95]. He never removed the firearm from its holster, brandished it, or threatened to use it during the interview. The agents did not handcuff Baker or threaten to handcuff Baker. In fact, they specifically and repeatedly told her no one was going to be arrested. Baker testified Agent Dunkle and Investigator Schoonover sat on either side of the door. Though her brief casts this as "cutting off" the exit, Baker's own testimony does not support that they physically blocked the door, nor did they tell her she was unable to leave. Simply standing or sitting near (or on either side of) the door is insufficient to show that her movement was restrained. *See c.f. United States v. Craigshead*, 539 F.3d 1073, 1086 (9th Cir. 2008) (finding custody when target was placed in a

11

"back storage room" with officer "leaning with his back to the door in such a way as to block [the defendant's] exit from the room" while standing and silently staring at target).

The Sixth Circuit reversed a district court's finding of custodial interrogation under similar facts in *United States v. Martinez*, 795 F. App'x 367 (6th Cir. 2019). There, the defendant was "confined to a conference room in which two armed FBI agents were seated between him and a closed door" which the Sixth Circuit found to be "not nearly enough" to prove it was a custodial interrogation. *Id*. at 375. The Court pointed to the following facts to find that his freedom of movement was not restricted: the interview took place in a large room, Martinez was not handcuffed until his formal arrest at a later time, there was no evidence he was not free to move about the room, the door to the room was closed but unlocked, the armed agents never brandished their weapons or even showed them to the Martinez, and Martinez was allowed to check his texts during the interview and make calls after the interview. *Id*. On this factor, the Court found that "the absence of restraints[ ] cut strongly against *Miranda* custody." *Id*.

Here, Baker particularly stressed the isolated nature of her interview, which she emphasized was not only the location of the interview room, but the fact that she was not permitted to speak to her boss or lawyer or use her cell phone during the interview. Although this might point towards a finding of a custodial interview, the facts developed at the hearing either refute or cast doubt on the veracity of Baker's narrative.

Baker initially stated in her pre-hearing affidavit that, shortly after arriving at LabTox, she noticed Hinkle was calling her cell phone, and she asked Dunkle whether she could answer the phone, but he told her she could not do so. However, at the hearing, Baker testified that it may have been some other agent that prohibited her from answering her phone. Similarly, Baker stated in her affidavit that Hinkle "continued to call [her] phone" during the interview and that "the agents

12

could hear [her] phone ringing but would not let [her] answer it." But after being confronted with the fact that, per the interview recording, agents never audibly instructed her not to answer her phone or told her she could not speak to her lawyer. Baker then claimed that agents only *non-verbally* instructed her not to answer her the phone after she indicated to them that her phone was ringing. And, significantly, the Cellebrite report establishes that Hinkle called only twice—both at 9:07 a.m., approximately two minutes before Schoonover began his audio recording and before the interview even began. The Cellebrite report establishes that no attorney called her during her interview in clear contradiction to her testimony. Moreover, after the interview concluded, Baker did request to speak with LabTox's counsel and was immediately taken to counsel's location.

Accordingly, the record contains no evidence buttressing Baker's shifting suggestion that she was, at any point during her interaction with law enforcement on December 16, 2020, prohibited from speaking to LabTox's counsel or use her cell phone. Baker's freedom was not so restrained as to constitute custody.

    **4.** **Whether Agents Told Baker She was not Required to Answer Questions**

Baker claims that the agents did not expressly tell her she was free to leave. Whether law enforcement told a target they were free to leave "is only one of several factors to consider, and it is not dispositive." *United States v. Levenderis*, 806 F.3d 390, 401 (6th Cir. 2015) (concluding that, "[i]n light of the surrounding circumstances, including the familiar setting, defendant's ability to make and receive calls, the fact that agents never told defendant he was *not* free to leave, and the absence of any other indicia of coerciveness, this factor alone does not transform an otherwise non-custodial setting into a custodial one"). The circumstances surrounding Baker's interview made it implicitly clear that Baker did not have to speak with the agents. At the outset of the interview, Dunkle clearly stated to Baker that no one was going to be arrested that day and that agents were only on the premises to execute a search warrant and gather information. Agents

questioned Baker in an office room familiar to her, her cell phone was in her possession throughout the duration of the interview, and the interview was, even by Baker's measure, cordial.

B.     BAKER'S RIGHT TO COUNSEL WAS NOT VIOLATED

Baker next argues that suppression is warranted because her right to counsel was denied when she was directed not to answer her phone when her lawyer was calling and was told by the agents that she did not need an attorney. However, the right to counsel pursuant to *Miranda* can only be invoked during a custodial interrogation:

> We have in fact never held that a person can invoke his *Miranda* rights anticipatorily, in a context other than "custodial interrogation" . . . . The fact that we have allowed the *Miranda* right to counsel, once asserted, to be effective with respect to future custodial interrogation does not necessarily mean that we will allow it to be asserted outside the context of custodial interrogation, with similar effect.

*McNeil v. Wisconsin*, 501 U.S. 171, 182 n.3 (1991). *See also United States v. Malcolm*, 435 F. App'x 417, 422, (6th Cir. 2011) (Defendant "was not in custody at the time that he mentioned the possibility of speaking with an attorney and was therefore not entitled to counsel under Miranda."). In a noncustodial setting, the defendant "is in control, and need only shut his door or walk away to avoid police badgering." *Montejo v. Louisiana*, 556 U.S. 778, 795 (2009).

Baker's argument assumes that she was in custody for purposes of *Miranda*. Because Baker was not in custody, *Miranda* does not apply, and Baker could not have invoked her right to counsel. Accordingly, Baker's argument that her right to counsel was denied when she was directed not to answer her phone or told by agents that she did not need an attorney does not constitute a separate basis for suppression of any statements made to agents on December 16, 2020.

III.     <u>CONCLUSION</u>

Based on the totality of the circumstances on December 16th, an objectively reasonable individual in Baker's position would have felt entirely free to end the interaction with the agents

at any point. Accordingly, Baker was not in custody for *Miranda* purposes, and there is no *Miranda* violation here to remedy.

For the reasons thoroughly discussed, the Court **RECOMMENDS** that the District Judge **DENY** Baker's Motion to Suppress [DE 20]. The Court directs the parties to 28 U.S.C. § 636(b)(1) for appeal rights concerning this recommendation, issued under subsection (B) of the statute. **Within fourteen days** after being served with a copy of this recommended decision, any party may serve and file written objections to any or all portions for consideration, *de novo*, by the District Court.

Entered this the 2nd day of September, 2022.

MATTHEW A. STINNETT
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF KENTUCKY